**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-00012-NYW-NRN

MOUREENE TAYLOR,

     Plaintiff,

v.

KAISER FOUNDATION HEALTH PLAN OF COLORADO,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant Kaiser Foundation Health Plan of Colorado's ("Kaiser" or "Defendant") Motion for Summary Judgment (or "Motion"). [Doc. 29, filed March 9, 2022]. After carefully considering the Parties' briefing and the applicable case law, this Court finds that oral argument will not materially assist in the disposition of the instant Motion and respectfully **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment.[1]

### BACKGROUND

This action, initiated on January 4, 2021, arises from the employment of Plaintiff Moureene Taylor ("Ms. Taylor" or "Plaintiff") with Kaiser. *See* [Doc. 1]. Ms. Taylor alleges Kaiser discriminated against her based on her race, by subjecting her to a hostile work environment, and failing to pay her severance at the end of her employment. *See* [*id.* at ¶ 3]. In the Complaint Ms. Taylor asserts two claims against Kaiser:

---

[1] This civil action was previously assigned to the Honorable Regina M. Rodriguez. *See* [Doc. 20]. On August 8, 2022, this action was reassigned to the undersigned upon her appointment as United States District Judge. [Doc. 36].

1. Race-based hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count I); and

2. Discriminatory failure to pay severance under Title VII (Count II).

*See* [*id.* at ¶¶ 33–42]. Kaiser answered the Complaint on March 9, 2021. [Doc. 13]. Following the close of discovery, Defendant filed the instant Motion for Summary Judgment on March 9, 2022. [Doc. 29]. Plaintiff responded on March 30, 2022, [Doc. 30], and Defendant replied on April 20, 2022, [Doc. 35].[2] The Motion for Summary Judgment is thus ripe for disposition.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted). It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

To satisfy her burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements

---

[2] A final pretrial conference was previously scheduled for March 22, 2022, *see* [Doc. 18], but was later vacated on July 27, 2021, *see* [Doc. 21]. The final pretrial conference has not since been rescheduled.

based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or a denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). For instance, "if th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## ANALYSIS

As mentioned, Plaintiff asserts two claims against Kaiser under Title VII: (1) race-based hostile work environment (Count I), and (2) discriminatory failure to pay severance (Count II). Defendant seeks summary judgment as to both claims.

## I.  Undisputed Material Facts

As a preliminary matter, the Court notes that Defendant's opening brief contains a list of 50 purported undisputed material facts, numbered 1 to 50, *see* [Doc. 29 at 2–10]; and Plaintiff's

Response contains 37 additional material facts, numbered 50 to 85, *see* [Doc. 30 at 3–14].[3]  In its

Reply, Defendant states that it "does not dispute the 'facts' alleged in paragraphs 51, 52, 55, 59,

60, 64, 67, 70, 74, 76-80, 83 (both paragraphs), and 84 [of the Response], but it notes they are

based on inadmissible hearsay, speculation and conclusory allegations, or are immaterial."  [Doc.

35 at 2].  Notably, however, Defendant fails to address all of the proposed additional material facts

identified in Plaintiff's Response—i.e., those that it claims, at least implicitly, are in dispute.  *See*

[*id.* at 2–7 (addressing only Plaintiff's statements at paragraphs 61–63, 65–66, 68, 71, 72, 75, and

82 of the Response)].   Accordingly, insofar as Defendant fails to address any of Plaintiff's

statements of additional material facts, and those statements are properly supported by the record,

the Court deems those statements undisputed.

     With that in mind, the Court draws the following relevant, material facts from the record

before it, which are undisputed, unless otherwise indicated.

### A.    Plaintiff's Employment with Kaiser

1.     In February 2018, Kaiser hired Ms. Taylor, who is Black,[4] as an on-call massage

therapist in Kaiser's Center for Complimentary Medicine ("CCM" or the "Center").   During her

employment, Ms. Taylor was a member of the Service Employees International Union Local 105

("Union") and subject to a collective bargaining agreement ("CBA").  [Doc. 29-1 at 15:9–16:9,

---

[3] Although Plaintiff begins her numbering at no. 50, Plaintiff states that her intention was to "pick up [the numbers] where [D]efendant stopped."  [Doc. 30 at 3 n.1].  In addition, there are two paragraphs identified as paragraph 83.  *See* [*id.* at 13].

[4] Although Defendant uses the term "African American" when referring to Plaintiff, the Court will use the term "Black" in this Order—unless quoting Defendant directly—given that Plaintiff does not use the term "African American" in either her Response, [Doc. 30], or the Complaint, [Doc. 1].

18:1–10; Doc. 29 at ¶ 1; Doc. 30 at 1].[5]

2.      At the time Ms. Taylor worked for Kaiser, complimentary medicine included massage therapists and acupuncture and chiropractic providers.  [Doc. 29-2 at 51:4–11; Doc. 29-3 at ¶ 4; Doc. 29 at ¶ 2; Doc. 30 at 1].

3.      The CCM offers its services at nine locations throughout Colorado.  Ms. Taylor initially worked at the CCM facility in Lakewood.  [Doc. 29-1 at 16:22–17:10; Doc. 29-3 at ¶ 5; Doc. 29 at ¶ 3; Doc. 30 at 1].

4.      On-call employees are "hired to work on an intermittent basis[,]" are expected "to work at all facilities as directed by the appropriate supervisor," and can cover for other massage therapists who are unavailable to work.  In addition, on-call employees are ineligible for benefits; they are paid an "in-lieu of benefits" premium of $1.50 per hour above regular pay.  [Doc. 29-4 at 11–12; Doc. 29-1 at 16:24–17:3; Doc. 29 at ¶¶ 4–5; Doc. 30 at 1].

5.      Robert Smigelski, DC, Lac ("Dr. Smigelski") was Ms. Taylor's direct supervisor during her employment.  Dr. Smigelski reported to Melissa de Picciotto ("Ms. de Picciotto"). [Doc. 29-1 at 135:12–13; Doc. 29-2 at 4:18–23, 5:10–17; Doc. 29 at ¶ 6; Doc. 30 at 1].  In addition, at Kaiser's Rule 30(b)(6) deposition, Ms. de Picciotto testified that she reported to the Regional Administrator of Medical Specialties Greg Mills ("Mr. Mills") in approximately winter 2018 and

---

[5] For clarity, the Court will exclusively use paragraph numbers only when citing to Kaiser's Statement of Undisputed Material Facts in its opening brief, *see* [Doc. 29 at 2–10], and Plaintiff's Statement of Additional Material Facts in her Response, *see* [Doc. 30 at 3–14].  The Court will use page numbers when citing Plaintiff's Response to Kaiser's Statement of Undisputed Material Fact, *see* [Doc. 30 at 1–2]; and a combination of page numbers and, where appropriate, paragraph numbers when citing any exhibits containing multiple declarations *or* a declaration and any other exhibit, *see, e.g.*, [Doc. 30-1; Doc. 35-4].

spring 2019.  [Doc. 29-2 at 74:21–23].[6]

**B.   Plaintiff's Interpersonal Issues with Dallas Cox**

6.      Dallas Cox ("Mr. Cox") was a full-time acupuncturist assigned to Kaiser's Lakewood facility.  Mr. Cox did not have any supervisory authority over Plaintiff.  [Doc. 29-1 at 20:1–4; Doc. 29-2 at 16:17–19; Doc. 29-3 at ¶ 7; Doc. 29 at ¶ 7; Doc. 30 at 1].

7.      Ms. Taylor had "major conflicts" with Mr. Cox.  [Doc. 30-1 at 1, ¶ 2; Doc. 30 at ¶ 51; Doc. 35 at 2].

8.      For instance, soon after Ms. Taylor started working at Kaiser, Mr. Cox told a patient—who had been working with Plaintiff—that the patient would need to continue seeking massage services from Ms. Taylor until the patient realized that Ms. Taylor's services were ineffective, before seeking treatment from Mr. Cox, upon which time the patient would "be okay." [Doc. 29-1 at 19:20–22:9].[7]  Mr. Cox's statement in front of the patient was "unprofessional and humiliating" for Ms. Taylor.  [Doc. 30 at ¶ 51; Doc. 35 at 2].

9.      On another occasion, Mr. Cox and Plaintiff were discussing an article when Mr. Cox accused Plaintiff of using the phrase, "you people."  [Doc. 1 at ¶ 6; Doc. 29-1 at 34:12–38:8].  Plaintiff interpreted this comment as hostile and based on her race on the basis that Mr. Cox was talking about people as groups, and to her, "'you people' is a loaded term . . . that people usually equate in that particular way."  [Doc. 29-1 at 37:11–38:8].  During her deposition, Plaintiff

---

[6] The Parties do not identify this fact in their briefs.  *See* [Doc. 29; Doc. 30; Doc. 35].  However, there can be no reasonable dispute regarding *what* Kaiser testified.  Moreover, although the Court "need only consider only the cited materials" when deciding a motion for summary judgment, "it *may* consider other materials in the record" as well.  Fed. R. Civ. P. 56(c)(3) (emphasis added).

[7] At her deposition, Plaintiff explained that she was providing massage services to the patient, who "was finding some relief, but wanted to know if there were other avenues" or "treatment modalities" that would provide her further relief, which is when Plaintiff introduced the patient to Mr. Cox.  [Doc. 29-1 at 19:20–22:9].

provided no additional context to this statement.  [*Id*.]; *see also* [Doc. 29 at ¶ 9; Doc. 30 at 1].

10.    On April 5, 2018, Mr. Cox approached Plaintiff, had her sit down, stood over or in front of her, and he read from a list regarding various expectations of Plaintiff, stating he expects professionalism.  [Doc. 29-1 at 24:22–27:8; Doc. 29-5 at 1–2].  Ms. Taylor perceived Mr. Cox's standing over her as a "power play."  [Doc. 30-1 at 1, ¶ 1; Doc. 30 at ¶ 51; Doc. 35 at 2].

11.    Shortly after April 5, 2018, Plaintiff told Dr. Smigelski about the "bullying" and daily "passive-aggressive" behavior from Mr. Cox.  Plaintiff did not tell Dr. Smigelski that she felt Mr. Cox's treatment toward her was because of her race.  [Doc. 29-1 at 29:12–31:18, 44:23–45:3; Doc. 29 at ¶ 11; Doc. 30 at 1].

12.    During this meeting, Plaintiff and Dr. Smigelski discussed the need for a massage therapist at the "Midtown" clinic or another Kaiser location.  [Doc. 29-1 at 29:12–30:9; Doc. 29 at ¶ 12; Doc. 30 at 1].  Dr. Smigelski initially wanted Mr. Cox and Ms. Taylor to meet and try to work out their differences, but when that failed, he explained to Ms. Taylor that she could stay at Lakewood or move to a different location, and she agreed to move.  [Doc. 29-1 at 30:4–9, 32:15–22; Doc. 29-6; Doc. 29-2 at 18:24–19:19; Doc. 29 at ¶ 12; Doc. 30 at 1].

13.    Although Ms. Taylor agreed to the move, she "would have preferred that Dr. Smigelski try to change Mr. Cox's behavior, but he did not seem willing to go through that effort." [Doc. 30-1 at 1, ¶ 5; Doc. 30 at ¶ 54].[8]

14.    As an on-call therapist, Plaintiff was required to work at different locations to cover full-time employees who were out, whereas Mr. Cox, a full-time employee, was assigned to a specific location.  [Doc. 29-2 at 16:2–19; Doc. 29 at ¶ 13; Doc. 30 at 1].

---

[8] Defendant does not respond to this statement in its Reply.  *See* [Doc. 35 at 2].  The Court therefore deems this fact undisputed.

15.     In May 2018, Mr. Cox put his coat and gym bag on Ms. Taylor's work desk and chair, an action which Plaintiff interpreted "as a way to intimidate her from using her own desk." [Doc. 29-1 at 39:18–40:9; Doc. 29 at ¶ 14; Doc. 30 at 1].

16.     Dr. Smigelski "chuckled" when Plaintiff complained to him that Mr. Cox had taken over her desk.  [Doc. 35-1 at 278:12–279:4; Doc. 30 at ¶ 52; Doc. 35 at 2].[9]

17.     During Ms. Taylor's last week at the Lakewood clinic, Mr. Cox put acupuncture needles on Plaintiff's massage table, which Plaintiff tossed into the hallway.  [Doc. 29-1 at 53:12–16; 54:2–25; Doc. 29 at ¶ 15; Doc. 30 at 1].

18.     Mr. Cox never used any racial slur against Ms. Taylor.  Nevertheless, Ms. Taylor assumes that he treated her differently based on her race.  However, Ms. Taylor has no examples of this differential treatment.  [Doc. 29-1 at 23:1–24:20, 28:23–29:7, 37:17–38:15; Doc. 29 at ¶ 16; Doc. 30 at 1].

19.     Mr. Cox also treated other staff badly, including demeaning them.  For example, he called another coworker, who is not Black, scatterbrained.  [Doc. 29-1 at 27:1–28:8, 39:2–8; Doc. 29 at ¶ 17; Doc. 30 at 1].

20.     Ms. Taylor "complained to Dr. Smigelski approximately five times about other incidents of harassment from Mr. Cox, but [Dr. Smigelski] did not seem interested in addressing them and nothing changed with Mr. Cox."  [Doc. 30-1 at 1, ¶ 4; Doc. 30 at ¶ 53].[10]

---

[9] In response to Plaintiff's assertion that "Dr. Smigelski laughed when she told him that Mr. Cox had taken over her desk" and stated, "[t]hat sounds like Dallas," [Doc. 30 at ¶ 52], Defendant objects on the basis that Plaintiff's assertion "directly contradicts her deposition testimony." [Doc. 35 at ¶ 51].  The Court agrees, as the deposition testimony speaks for itself.  *See* [Doc. 35-1 at 278:12–279:4].  However, Plaintiff testified that Dr. Smigelski "chuckled," [*see id.*], and the Court therefore deems this fact undisputed.

[10] Defendant does not respond to this statement in its Reply.  *See* [Doc. 35 at 2].  The Court therefore deems this fact undisputed.

### C.   Incidents with Dr. Smigelski and/or Ms. de Picciotto

21.   In November 2018, Ms. Taylor and Roberta "Birdie" Johnson ("Ms. Birdie Johnson"), a regular, full-time massage therapist and Union steward, who is Black, were omitted from an invitation to a meeting.  [Doc. 29-8 at 1–2].  Ms. de Picciotto sent them an invitation shortly after she learned of the error.  [Doc. 29-2 at 60:7–61:16; Doc. 29-9 at 2–3; Doc. 29 at ¶ 22; Doc. 30 at ¶ 22].[11]

22.   Initially, employees at the CCM "were all on a first name basis."  However, in or around December 2018, Dr. Smigelski and Ms. de Picciotto "began referring to Ms. Taylor by her last name," which made Plaintiff "feel like she was no longer part of the group."  Later, Ms. de Picciotto "did not even address" Ms. Taylor and Ms. Birdie Johnson—the only two Black massage therapists—at group meetings, but would greet everyone else.  [Doc. 30 at ¶ 58; Doc. 30-1 at 2, ¶ 9; Doc. 29-1 at 105:21–108:19].

23.   In November 2018, Ms. Taylor and Ms. Birdie Johnson walked into a meeting at the same time, and Ms. de Picciotto greeted everyone but them.  [Doc. 29-1 at 131:5–132:9; Doc. 29 at ¶ 24; Doc. 30 at 1].

24.   In December 2018, Ms. de Picciotto began to "sing" out Ms. Taylor's name in a "saccharine" manner.[12]  [Doc. 29-1 at 124:2–125:9; Doc. 30-1 at 2, ¶ 9; Doc. 29 at ¶ 26; Doc. 30 at 1].

25.   In approximately January 2019, a representative from Seattle Kaiser visited the CCM because Seattle Kaiser was considering instituting a similar unit in Seattle.  Ms. Taylor

---

[11] In her Response, Plaintiff disputes only that the omission of her and Ms. Birdie Johnson from the meeting invitation was inadvertent.  [Doc. 30 at ¶ 22].

[12] At her deposition, Plaintiff defined "saccharine manner" to mean "[c]hiding, pretending to be sweet when you're actually really upset."  [Doc. 29-1 at 44:4–8].

attempted to introduce herself to the Seattle representative, but Ms. de Picciotto placed her body between Ms. Taylor and the representative, blocking Ms. Taylor from saying hello.  Ms. de Picciotto later introduced the representative to Hannah, one of the other massage therapists.  [Doc. 30-1 at 2, ¶ 10; Doc. 30 at ¶ 59; Doc. 35 at 2].[13]

26.    "On a few occasions" around Christmas 2018 and January 2019, when Ms. Taylor would make a comment in a staff meeting, Ms. de Picciotto would "ignore[e] Ms. Taylor" by responding, "Whatever.  Let's go on."  [Doc. 30-1 at 2, ¶ 11; Doc. 30 at ¶ 60; Doc. 35 at 2].

27.    During approximately the last six months of Ms. Taylor's employment, Ms. de Picciotto was "extremely terse with [Ms. Taylor] while her tone did not change with any of the white massage therapists."  [Doc. 30-1 at 2, ¶¶ 9–11; Doc. 30 at ¶ 60; Doc. 35 at 2].

28.    On three or four occasions, Ms. Taylor complained to Dr. Smigelski that receptionist Heather Lyall ("Ms. Lyall")[14] was "needlessly harassing" Plaintiff.  In one incident, in approximately November 2018, Plaintiff had arranged a translator for a patient through Kaiser. In response, Ms. Lyall "yelled at [Plaintiff] when [Plaintiff] allowed the patient's son to be a translator for the father because the father was uncomfortable with a strange translator." According to Plaintiff, a receptionist should always follow the provider's decision on such matters. Plaintiff had never seen Ms. Lyall "act so brazenly with any other provider."  [Doc. 30-1 at 4, ¶ 24; Doc. 30 at ¶ 73].

29.    In approximately September or October 2018, Plaintiff discovered that she and Ms.

---

[13] Although Defendant does not dispute this fact, *see* [Doc. 35 at 2], Defendant claims that this assertion is based on inadmissible hearsay.  [*Id.* at 6].  The Court disagrees that Plaintiff's statement recounting a first-hand event constitutes inadmissible hearsay, and Defendant provides no support for its claim.

[14] Plaintiff spells Ms. Lyall's last name as "Lyle," *see* [Doc. 30 at 9, ¶ 73], but Defendant claims that the appropriate spelling is "Lyall," [Doc. 35 at 2 n.1].  The Court will use "Lyall," given the fact that Defendant employed Ms. Lyall.

Birdie Johnson had been removed as medical providers from Kaiser's website.  [Doc. 30-1 at 2, ¶ 7; Doc. 30 at ¶ 56; Doc. 35 at 2].[15]

30.     Ms. Birdie Johnson "was told" that she was removed as a provider from the Kaiser website "because she was on medical leave."  However, "a white employee, Jonathan Berkshire who was also on medical leave, was not taken off the website."  When Ms. Birdie Johnson questioned her removal with the information technology department ("IT"), IT informed her "that they would only take a provider off the website if that person's department asked them to do so." [Doc. 30-1 at 6, ¶ 3; Doc. 30 at ¶ 77; Doc. 35 at 2].

31.     Ms. Taylor experienced migraines due to work-related stress which, in turn, caused her to vomit.  Although Ms. Taylor suffered from migraines before her employment, she experienced more frequent migraines, approximately one per week, during her last five to six months of employment at Kaiser.  [Doc. 30 at ¶ 69; Doc. 30-1 at 4, ¶ 20; Doc. 35 at 4].[16]

**D.     Removal of "Wish Stars" from Plaintiff's Workspace**

32.     The Midtown lobby had a community board, and on it were "wish stars," i.e., notes

_____

[15] In its Reply, Defendant appears to dispute this fact on the basis that "Ms. Taylor and Ms. [Birdie] Johnson state in their declarations that they were removed from the website, but they do not identify the period of removal, provide admissible evidence as to why they were removed, and, importantly, Ms. Taylor admitted in her deposition that other providers may have been removed from the website as well."  [Doc. 35 at 2].  Defendant, however, does not dispute that Plaintiff and Ms. Birdie Johnson were indeed removed from Kaiser's website.  Moreover, contrary to Defendant's assertion, Plaintiff's declaration identifies the period of removal as "approximately September/October, 2018."  [Doc. 30-1 at 2, ¶ 7].  Defendant's remaining statements regarding (1) the basis for Kaiser's removal of Plaintiff and Ms. Birdie Johnson from the website and (2) Plaintiff's acknowledgment that "other providers *may* have been removed from the website" are immaterial for the purposes of establishing that Plaintiff and Ms. Birdie Johnson were indeed removed from Kaiser's website.  Accordingly, the Court deems this fact undisputed.

[16] Although Defendant disputes the frequency with which Plaintiff experienced migraines before her employment with Kaiser, Defendant does not dispute that Plaintiff experienced more frequent migraines during the last five to six months of her employment, or that the migraines caused Plaintiff to vomit.  *See* [Doc. 35 at 4].  Thus, the Court deems these facts undisputed.

containing personal messages handwritten by patients.  Plaintiff placed some of the "wish stars" above a desk she shared with Jenna Mears, who is not Black.  [Doc. 29-1 at 146:11–149:9, 150:2–151:22; Doc. 29-10 at 1; Doc. 29 at ¶ 27; Doc. 30 at 1].

33.    On February 21, 2019, Plaintiff discovered that the "wish stars" above her workspace had been removed.  [Doc. 29-1 at 146:11–13, 151:19–22, 156:5–12; Doc. 29-10 at 1; Doc. 29 at ¶ 28; Doc. 30 at 2].[17]

34.    Dr. Smigelski informed Plaintiff that the "wish stars" violated Kaiser's Work Environment Policy.  However, Ms. Taylor believed the stars were removed from her workspace because she is Black.  [Doc. 29-1 at 163:21–164:23; Doc. 29-10 at 2–3; Doc. 29 at ¶ 30; Doc. 30 at 1].

### E.    Plaintiff's Complaint(s) of Discrimination

35.    On March 4, 2019, Ms. Taylor met with Mr. Mills, the Regional Administrator of Medical Specialties, to report complaints of racial discrimination, including her interactions with Mr. Cox, having things removed from her workspace, and Dr. Smigelski and Ms. de Picciotto not saying hello.  [Doc. 29-1 at 227:15–18, 229:10–230:14; Doc. 29-2 at 75:24–76:1, 82:13–84:12].  Ms. Taylor did not ask Mr. Mills to take any action.  *See* [Doc. 29-2 at 95:11–96:6; Doc. 29 at ¶ 31; Doc. 30 at 1].

36.    Nevertheless, Ms. Taylor recalls Mr. Mills stated that "he would look into [her] claim of racial discrimination," although Plaintiff is not aware of any investigation into her complaint that Mr. Mills conducted.  [Doc. 30 at ¶ 68; Doc. 30-1 at 3, ¶ 19; *id.* at 8; Doc. 35 at 3–

---

[17] Plaintiff disputes this fact solely on the basis that she "believes that receptionist Heather [Lyall] removed the items."  [Doc. 30 at 2].  However, the identity of the person who removed the items is not at issue in this paragraph. Accordingly, the Court deems this fact undisputed.

4].[18]

37.     Union representative Colleen Johnson ("Ms. Colleen Johnson")[19] attended the meeting as well.  *See* [Doc. 30-1 at 8; Doc. 29-1 at 56:2–3].

38.     At the 30(b)(6) deposition of Kaiser, Kaiser's representatives testified that the concerns Ms. Taylor raised with Mr. Mills "were more interpersonal, between coworkers" and Mr. Mills "felt that nothing . . . rose to the level of . . . unlawful racial discrimination."  [Doc. 29-2 at 95:17–22].  Kaiser also testified that Mr. Mills "felt that he listened to [Plaintiff's] complaint" and "addressed any of those concerns with either [Ms. de Picciotto] or Rob Smigelski."  [*Id.* at 80:9–23]; *see also* [Doc. 29 at ¶ 32; Doc. 30 at ¶ 32].[20]

---

[18] Defendant disputes these facts on the grounds that (1) Plaintiff misidentifies Mr. Mills as a HR employee instead of the Regional Administrator of Medical Specialties; (2) Plaintiff did not request that Mr. Mills take any particular action with respect to her complaints; and (3) although Union representative Colleen Johnson states in her declaration that Mr. Mills should have investigated Plaintiff's complaints pursuant to "Kaiser's rules," Ms. Colleen Johnson "provides no support for her conclusory statement," including not identifying such rules.  [Doc. 35 at 3–4].  The Court does not find that any of these contentions create a factual dispute.  First, regardless of whether Mr. Mills was a HR employee, there is no dispute that Plaintiff and Ms. Colleen Johnson attended a meeting with Mr. Mills where Plaintiff complained of  racial discrimination.  Second, although Plaintiff does not dispute that she "did not ask Mr. Mills to take any action," [Doc. 29 at ¶ 31; Doc. 30 at 1], Defendant does not present any evidence to dispute Plaintiff's assertion that Mr. Mills stated he would investigate Plaintiff's claims.  *See* [Doc. 3 at 4 (arguing that, "[r]egardless of whether Mr. Mills said he would look into Ms. Taylor's claim of racial discrimination, it is undisputed that Ms. Taylor did not ask Mr. Mills to take any action")].  Finally, with respect to Ms. Colleen Johnson's assertion regarding "Kaiser's rules" relating to discrimination complaints, whether Kaiser has a rule requiring compulsory investigations of discrimination complaints is irrelevant to whether Mr. Mills told Plaintiff he would investigate her complaints.

[19] To avoid any confusion with Birdie Johnson, this Court will refer to each individual by her full name.

[20] In her Response, Plaintiff disputes Defendant's summary of Kaiser's 30(b)(6) deposition on this issue on the basis that "Ms. Taylor specifically told Mr. Mills that she was suffering racial discrimination."   [Doc. 30 at 2, ¶ 32].   However, Defendant acknowledges that Plaintiff "complain[ed] of unlawful racial discrimination" in her meeting with Mr. Mills.  [Doc. 29 at ¶ 32].  In any event, the Parties cannot dispute the direct testimony from the 30(b)(6) deposition, and therefore the Court cites that testimony, as opposed to Defendant's summary of the same.

39. Ms. Taylor never complained about racial discrimination or harassment to Dr. Smigelski or Ms. de Picciotto, and never pursued a grievance through the Union with respect to alleged discrimination. Nor does Ms. Taylor allege that anyone at Kaiser ever used a racial slur. [Doc. 29-1 at 121:19–122:4, 225:4–226:17, 233:5–234:25, 304:4–21, 306:5–8; Doc. 29 at ¶ 49; Doc. 30 at ¶ 49].

40. Ms. Taylor filed a charge of discrimination with the Colorado Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC") on November 26, 2019 (the "Charge"), alleging discrimination based on race and disability, as well as retaliation for engaging in protected activity. [Doc. 29-14].

### F. Four Patients Complain about Plaintiff

41. After four patients complained over several months about Ms. Taylor, on April 8, 2019, Dr. Smigelski, Ms. Taylor, and her Union Steward participated in a Joint Objective Discovery ("JOD") meeting, which is designed for the parties to discuss behavioral or performance issues, and to determine if further action, such as discipline, may be warranted. [Doc. 29-1 at 177:7–178:11; Doc. 29-11 at 5; Doc. 29 at ¶¶ 39–40; Doc. 30 at 1]. A JOD is not discipline and is not placed in an employee's personnel file. [Doc. 29-12 at ¶ 7].

42. Dr. Smigelski ultimately did not issue disciplinary action because Plaintiff accepted responsibility. [Doc. 29-1 at 185:11–18; Doc. 29-2 at 33:14–36:7; Doc. 29-11 at 5–6; Doc. 29 at ¶ 41; Doc. 30 at ¶ 41].

### G. Disbandment of Massage Therapy Services and Severance Payments

43. In approximately March or April 2019, the CCM held a staff meeting, which was attended by Dr. Smigelski and Ms. de Picciotto, "where management explained that the massage-therapy group was being disbanded on May 31, 2019." After "management" left the meeting, Cori West, a massage therapist, approached Plaintiff "and started yelling at [Plaintiff], poking her finger

at [Plaintiff's] face, almost touching it." Ms. West "was yelling[,] 'I will not allow you to speak. You will not talk.'" Ms. West stated that "she was close to management and knew what was going on," and "yelled that [the disbandment] was all because of [Ms. Birdie Johnson] and [Plaintiff]." Plaintiff reported Ms. West's conduct to Dr. Smigelski, "but he did nothing." [Doc. 30-1 at 4, ¶¶ 21–22; Doc. 30 at ¶¶ 70–71; Doc. 35 at 4].[21]

44.     Kaiser discontinued massage therapy services on May 31, 2019—and laid off all nine massage therapists—as part of a larger reorganization of its Colorado operations. [Doc. 29-12 at ¶ 9].

45.     Pursuant to the CBA, regular full- or part-time employees in a status of 20 hours or more per week are eligible for severance.     On-call employees are not eligible for benefits, including severance, unless they were eligible for reclassification as a regular employee. [Doc. 29-4 at 11–12; Doc. 29 at ¶ 43; Doc. 30 at ¶ 43].

46.     At the time of the layoff, the six regular full- or part-time massage therapists, including Ms. Birdie Johnson, received severance payments. [Doc. 29-12 at ¶ 13; Doc. 29 at ¶ 44;

---

[21] In her Response, Plaintiff states that she "reported her 'assault' to Dr. Smigelski," [Doc. 30 at 9, ¶ 71], and, on Reply, Defendant disputes this assertion on the basis that "[t]here is no evidence that Ms. Taylor reported an 'assault' to Dr. Smigelski or anyone at Kaiser," [Doc. 35 at 4]. It is unclear whether Defendant disputes Plaintiff's use of the term "assault" or that Plaintiff reported Ms. West's conduct altogether. In any event, Plaintiff supports this assertion by citing to her declaration stating she "reported her assault . . . to Dr. Smigelski, but he did nothing." [Doc. 30-1 at 4, ¶ 22]. Thus, given that Plaintiff provides evidence in the form of a declaration—based on her first-hand knowledge of an action she claims she undertook—Defendant does not create a fact dispute on this issue simply by denying the existence of evidence that Plaintiff indeed undertook such actions. *See* Fed. R. Civ. P 56(c)(4) (stating that affidavits or declarations "must be made on personal knowledge"). Accordingly, the Court finds that it is not disputed that Plaintiff reported Ms. West's *conduct* (as opposed to her "assault") to Dr. Smigelski.

In addition, Plaintiff asserts that Ms. West "believed that management wanted to get rid of its two Black massage therapists and the easiest way to hide any possible discrimination was simply to disband the group." [Doc. 30-1 at 4, ¶ 21]. However, unlike Plaintiff's first-hand recounting of her interaction with Ms. West, Plaintiff provides no support for Ms. West's subjective belief, and therefore the Court finds this claim to be disputed.

Doc. 30 at 1].

47.    None of the three on-call massage therapists—Ms. Taylor, Rose Fagan and Christine Gutierrez—received severance payments.  Mses. Fagan and Gutierrez are not "African-American."  [Doc. 29-1 at 167:22–168:1; Doc. 29-12 at ¶ 14; Doc. 29 at ¶ 45; Doc. 30 at 1].

48.    "In May 2019, the Union inquired about Ms. Taylor's eligibility for severance; specifically, the Union wanted to know whether Ms. Taylor was a regular employee in a status of 20 or more hours per week."  [Doc. 29-12 at ¶ 15; Doc. 29 at ¶ 47; Doc. 30 at 1].

49.    After reviewing the Kronos records and a spreadsheet created by Ms. de Picciotto showing the number of hours Ms. Taylor had worked, Mark Stotik, Director of Human Resources ("HR") Consulting, in consultation with Ms. de Picciotto and Mr. Mills, determined that Ms. Taylor had worked a total of 1,207 hours, with 329 of those hours spent working for Ms. Birdie Johnson while she was out on various leaves of absence.[22]  "Based on those numbers, [Mr. Stotik] determined that Ms. Taylor worked fewer than 20 hours per week during the relevant time period and was not eligible for severance."  [Doc. 29-12 at ¶¶ 2, 16–17].[23]

---

[22] Although, in the Motion, Defendant references only Mr. Stotik's role in calculating the number of hours Plaintiff worked, *see* [Doc. 29 at ¶ 48], Mr. Stotik's affidavit reflects that Ms. de Picciotto created the spreadsheet "which shows both the total number of hours Ms. Taylor had worked" during the relevant time period and the number of hours she had spent covering for employees who were temporarily absent," [Doc. 29-12 at ¶ 16].  Likewise, one of the emails Defendant relies upon for support reflects that Mr. Mills reviewed Plaintiff's hours worked and determined that she "worked a total of 1,207 hours but at least 329 of those hours were coverage for Roberta Johnson at Smoky Hill."  [Doc. 29-13 at 2].

[23] Ms. Taylor claims to dispute this fact on the basis that she "does not deny the words in the CBA. However, in the spring of 2019, she received notice that her status had changed to a 'regular' employee which meant she would be entitled to severance."  [Doc. 30 at ¶¶ 43, 48].  Plaintiff's objection does not, however, present any dispute as to Kaiser's review of her time records or determination that she was ineligible for severance based on those records.  Accordingly, the Court deems this fact undisputed.

## II.   Race-Based Hostile Work Environment (Count I)

Kaiser first argues that Plaintiff's hostile work environment claim fails as a matter of law on the bases that (1) the alleged discrete, discriminatory acts that occurred before January 30, 2019 are time-barred;[24] (2) Defendant "had no knowledge of Mr. Cox's or other coworkers' alleged harassing behavior"; and (3) even if Defendant had such knowledge, "none of the actions taken by coworkers or supervisors, alone or together, were severe, pervasive, or racially motivated." [Doc. 29 at 12].

***Theory of the Case.***   Before turning to Kaiser's arguments, the Court begins by clarifying Ms. Taylor theory of her case. Specifically, in her Response, Ms. Taylor asserts that her "theory of the case" is "related to [Defendant's] ignoring of the Black employees." [Doc. 30 at 19]. Although Ms. Taylor does not cite any authority stating that such a theory supports a hostile work environment claim, Kaiser does not appear to dispute that a race-based hostile work environment claim can be based on a theory that the employer ignored a group of a employees from a particular racial group. Indeed, other courts have held that incidents of exclusion can, *in context*, form the basis of a hostile work environment. *Compare, e.g.*, *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 818 (6th Cir. 2013) (recognizing that "ignoring and ostracizing a coworker[,] if motivated by gender-driven animus, can be a form of . . . harassment that contributes to a hostile work environment") *with Noviello v. Boston*, 398 F.3d 76, 92 (1st Cir. 2005) ("[R]udeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim."). Rather, Kaiser argues that Ms. Taylor cannot establish the elements of her prima facie case (i.e., racial

---

[24] Although Defendant references two dates—January 27, 2019 and January 30, 2019—as the deadline related to Plaintiff's hostile work environment claim, *see* [Doc. 29 at 12–13], the correct date is January 30, 2019, as that was 300 days before Plaintiff filed the Charge on November 26, 2019, *see* [Doc. 29-14 at 1].

motivation or severity or pervasiveness of the conduct).  *See* [Doc. 35 at 7–11].  Accordingly, this Court proceeds to considering whether Plaintiff has presented a plausible theory of a race-based hostile work environment "related to [Defendant's] ignoring of the Black employees," [Doc. 30 at 19], beginning with whether Plaintiff's claim is time-barred for failure to exhaust administrative remedies, and then turning to the merits of Plaintiff's claim.

### A.    Exhaustion of Administrative Remedies

A claim under Title VII must be "preceded by filing a charge of discrimination with the EEOC [or appropriate state agency] and receipt of a 'Right-to-Sue' letter."  *Harp v. Dep't of Human Servs.*, 932 F. Supp. 2d 1217, 1224 (D. Colo. 2013) (citing 42 U.S.C. § 2000e-5).  "It is well-settled that a claim under Title VII cannot be brought with respect to discrete acts of discrimination that occur more than 300 days prior to the filing of the charge." *Id.* at 1224–25. (citations omitted).  Specifically, "each discrete incident of [discrimination] constitutes its own unlawful employment practice for which administrative remedies must be exhausted."  *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (quotations omitted).

In the context of a hostile work environment claim, "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).  So long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court." *Id.*  However, "there must be a relationship between the acts alleged after the beginning of the filing period and the acts alleged before the filing period."  *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005).  In other words, "a series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involved the same type of employment actions, occurred

relatively frequently, and were perpetrated by the same managers.'"  *Id.* at 1309 (brackets omitted)

(quoting *Morgan*, 536 U.S. at 120).

Here, Kaiser argues that because Ms. Taylor filed the Charge on November 26, 2019, any

events that occurred before January 30, 2019—i.e., 300 days before the Charge was filed—are

time-barred because they have no relation to the post-limitations' period allegations.  [Doc. 29 at

12–13].  Specifically, Kaiser identifies the following events as occurring *before* January 30, 2019:

> [1] Mr. Cox's alleged bullying; [2] Ms. de Picciotto's removal of the [Kaiser] President's picture; [3] Dr. Smigelski using "Ms. Taylor" instead of "Moureene"; [4] inadvertently omitting Ms. Taylor from a single meeting invitation, which was later corrected; [5] Dr. Smigelski and Ms. de Picciotto not addressing Ms. Taylor or Ms. Birdie Johnson as they walked into a group meeting[;] and [6] Ms. de Picciotto singing out Ms. Taylor's name in a saccharine manner.

[*Id.* at 13].  Kaiser argues that these acts "are different from and unrelated to" the following

"isolated acts" which occurred *after* January 30, 2019:

> [1] removal of the "wish stars" from [Plaintiff's] desk by an unknown person on or about February 21, 2019; [2] Dr. Smigelski and Ms. de Picciotto not scheduling on-call therapists for a short period of time in early Feb[ruary] 2019 based on the mistaken belief that doing so would reclassify them to full-time employees; [3] Dr. Smigelski asking about an accommodation because Ms. Taylor had a charting backlog; and [4] a JOD to address patient complaints.

[*Id.*].

In her Response, Ms. Taylor contends that Kaiser misunderstands the theory of her case.

Specifically, she argues that her hostile work environment claim is not time-barred because most

of "the incidents referenced in [P]laintiff's Statements of Additional Material Facts constitute the

discriminatory act" as those 'incidents are all related to the ignoring of Black employees," which

is "[P]laintiff's theory of the case."  [Doc. 30 at 19].

The Court respectfully agrees with Plaintiff that the actions identified by Defendant are not

time-barred.  For instance, it is undisputed that around December 2018 and January 2019, Ms. de

Picciotto "ignore[ed] Ms. Taylor" vis-à-vis dismissive responses in staff meetings, and "[i]n the

last six months or so" of Plaintiff's employment, Ms. de Picciotto "was extremely terse with [Plaintiff] while her tone did not change with any of the white massage therapists." [Doc. 30-1 at 2, ¶ 11; Doc. 30 at ¶ 60; Doc. 35 at 2 (Defendant stating that it "does not dispute the 'facts' alleged in paragraph[] . . . 60")]. It is also undisputed that, in approximately March or April 2019, Ms. West pointed her finger in Plaintiff's face and yelled at her and Plaintiff subsequently reported Ms. West's conduct to Dr. Smigelski, "but he did nothing." [Doc. 30 at ¶¶ 70–71; Doc. 35 at 4]. These instances, as well as several others addressed herein, sufficiently relate to Plaintiff's theory that her managers ignored her, including ignoring her complaints of misconduct perpetrated by other employees.

On Reply, Defendant asserts that "being left off of group emails, removed from the website, Ms. de Picciotto's comments, Ms. West pointing and yelling [at Plaintiff], and Ms. Lyall following [Plaintiff] out of Kaiser . . . are isolated and discrete incidents involving different individuals that do not demonstrate a pattern of behavior or continuing conduct." [Doc. 35 at 9 n.5]. Thus, Defendant continues, "any events occurring prior to January 27, 2019 are time-barred and cannot be considered under Ms. Taylor's hostile work environment claim." [*Id.*]. However, as noted above, Plaintiff's being left off of group emails and Ms. de Picciotto's comments relate to Plaintiff's theory that Kaiser created a hostile work environment by ignoring and/or ostracizing Plaintiff. Likewise, the removal of Ms. Taylor (and Ms. Birdie Johnson) from Kaiser's website relates to Plaintiff's argument that she "and Ms. [Birdie] Johnson were being ignored . . . as if they were not there, as if they did not exist." [Doc. 30 at 15]. Finally, the events related to Ms. West and Ms. Lyall occurred *after* January 30, 2019, which Defendant acknowledges. *Compare* [Doc. 30 at ¶ 70] *with* [Doc. 35 at 4]. Therefore, this Court respectfully declines to find that those events are time-barred for the purposes of Plaintiff's hostile work environment claim.

### B.      Plaintiff's Prima Facie Case

Under Title VII, it is "'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). "This includes an employee's claims of a hostile work environment based on race or national origin discrimination." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). Courts have recognized that "Title VII does not establish a general civility code for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012) (internal quotes and citations omitted).

To survive summary judgment on a claim alleging a racially hostile work environment, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004) (internal quotation marks and citation omitted). In addition, the plaintiff "must also produce evidence from which a rational jury could infer that she was targeted for harassment because of her . . . race." *Id.* More specifically, to carry her burden at the prima facie stage, a plaintiff must establish the following four elements:

> (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on [race]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (alteration in original) (quoting *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262–63 (10th Cir. 2005)). "'The applicable test

for a hostile work environment has both objective and subjective components.  A dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended,' and both must be proved."  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (quoting *Morris*, 666 F.3d at 664).

However, there "is not, and by its nature cannot be, a mathematically precise test" for a hostile work environment claim.  *Harris*, 510 U.S. at 22.  Courts determine whether an environment is hostile or abusive by looking at such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.  "[T]he severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact."  *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (internal quotation marks omitted); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007) (same).

With respect to the first two elements of her prima facie case, there is no dispute that Ms. Taylor, as a Black woman, is a member of a protected class.  In addition, "[h]er complaints to her supervisors establish that the harassment she perceived was unwelcome."  *Semsroth v. City of Wichita*, 304 F. App'x 707, 725 (10th Cir. 2008).  Defendant's Motion challenges whether Plaintiff can sufficiently establish the latter two elements of her prima facie case—namely, that the conduct she experienced was based on her race and whether, due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the Plaintiff's employment and created an abusive working environment.  *See* [Doc. 29 at 16–18].  Accordingly, the Court turns to these two elements below.

**1.    Plaintiff Has Raised a Genuine Issue Regarding Whether the Actions Taken Against Her Were Based on Her Race.**

In the Motion, Kaiser argues that it "had no knowledge of any alleged harassing behavior by Mr. Cox, which is dispositive as to those actions." [*Id.* at 14]. Specifically, Kaiser contends that "although [Plaintiff] complained about Mr. Cox to Dr. Smigelski, she never indicated that such conduct was race-based," and "[b]ecause Kaiser had no knowledge of Mr. Cox's or any other co-workers' alleged unlawful conduct when they worked together, it cannot be held liable for any allegedly harassing behavior by Mr. Cox or any other co-worker." [*Id.*]. Defendant also argues that "[n]one of the conduct or statements attributed to [Plaintiff's] coworkers or the supervisors, alone or together, are severe, pervasive, or racially motivated." [*Id.*]. With respect to the racial animus element of Plaintiff's hostile work environment claim, Defendant contends that Plaintiff has "provided *no* evidence of any racial enmity," including that "the conduct of which she complains is devoid of racially derogatory references." [*Id.* at 18]; *see also* [Doc. 35 at 9 ("[T]he conduct alleged in the Response includes no assertions of race-based comments or slurs, or any other overt racial behavior.")].

In her Response, Plaintiff contends that Defendant misunderstands Plaintiff's theory of the case. As explained above, Plaintiff asserts that her "theory of the case" is based on Defendant's "ignoring of . . . Black employees." [Doc. 30 at 19]. With respect to ignoring Black employees generally, Ms. Taylor argues that she and Ms. Birdie Johnson "were being ignored as if they were not there, as if they did not exist." She continues:

> [Plaintiff and Ms. Johnson] were taken off the emails; they were taken off the website; management did not acknowledge them when management walked into a room; management did not speak to them; Ms. DePicciotto [sic] gave Ms. Taylor the "Yeah, whatever"; Ms. [d]e Picciotto said, "I just can't talk to you people."

[Doc. 30 at 16]. Ms. Taylor also points to the instance when Dr. Smigelski ignored Ms. Birdie Johnson but greeted another employee who was sitting next to Ms. Birdie Johnson. [*Id.*]. Ms.

Taylor contends that "[t]hese things only happened to the black employees, not to the white employees." [*Id.*]. Ms. Taylor also insists that "everyone in the department knew" that management lacked respect for Plaintiff, and her coworkers engaged in certain conduct against Plaintiff "because they knew management would not interfere." [*Id.* at 16–17].

The Court finds that Plaintiff has sufficiently raised a genuine dispute of material fact regarding whether Kaiser's conduct toward her was based on her race and whether Kaiser knew of the alleged harassment of Ms. Taylor. As mentioned above, Ms. Taylor's hostile work environment claim is not based on the use of any overt race-based statements or slurs against her by anyone at Kaiser. Rather, Plaintiff claims that Kaiser—specifically, Dr. Smigelski, Ms. de Picciotto, and Mr. Mills—ignored Plaintiff and Ms. Birdie Johnson, the only two Black massage therapists at the CCM, including ignoring, avoiding, or failing to investigate complaints of race-neutral bullying or perceived racial discrimination. Indeed, in the context of gender, courts have specifically held that neutral-appearing conduct could still form the basis for a hostile work environment claim. *See, e.g., Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (recognizing that a plaintiff "can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment" and explaining that "what is important in a hostile environment claim is the *environment*, and gender-neutral harassment makes up an important part of the relevant work environment"); *Delsa Brooke Sanderson v. Wyo. Hwy. Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) ("[I]t is ordinarily the province of the jury to decide whether facially sex-neutral conduct constitutes harassment based on sex."); *Waldo*, 726 F.3d at 815 (recognizing that "'[f]acially neutral incidents may be included' in a hostile-work-environment analysis of the totality of the circumstances when there is 'some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact

discriminatory'" (quoting *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002)); *O'Rourke v. Providence*, 235 F.3d 713, 730 (1st Cir. 2001) (noting that "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct" because "such an approach not only ignores the reality that incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct").

> ***Dr. Smigelski.*** The record establishes the following undisputed material facts with respect to Dr. Smigelski:

- Soon after Ms. Taylor started working at Kaiser, Mr. Cox made a statement regarding Ms. Taylor in front of a patient that was "unprofessional and humiliating" for Ms. Taylor. [Doc. 30 at ¶ 51; Doc. 35 at 2].

- Shortly after April 5, 2018, Plaintiff complained to Dr. Smigelski about "bullying" and daily "passive-aggressive" behavior from Mr. Cox. [Doc. 29-1 at 29:12–31:18]. Plaintiff did not tell Dr. Smigelski that that she felt Mr. Cox's treatment toward her was because of her race. [*Id.* at 44:23–45:3].

- In May 2018, Mr. Cox placed his coat and gym bag on Plaintiff's desk. [Doc. 29-1 at 39:18–40:9; Doc. 29 at ¶ 14; Doc. 30 at 1]. Dr. Smigelski "chuckled" when Plaintiff told him that Mr. Cox had taken over her desk. [Doc. 30 at ¶ 52; Doc. 35 at ¶ 51; Doc. 35-1 at 278:12–279:4].

- In or around March or April 2019, Plaintiff reported to Dr. Smigelski that another employee, Ms. West, pointed her finger in Plaintiff's face and yelled at her, "but [Dr. Smigelski] did nothing" in response to the complaint. [Doc. 30 at ¶¶ 70–71; Doc. 35 at 4].

- On three or four occasions, Plaintiff complained to Dr. Smigelski that Ms. Lyall, the receptionist, was "needlessly harassing" Plaintiff.  [Doc. 30-1 at 4, ¶ 24; Doc. 30 at ¶ 73].

- Initially, employees at the CCM "were all on a first name basis."  However, at some point, Dr. Smigelski and Ms. de Picciotto "began referring to [Plaintiff] by her last name," which made Plaintiff "feel like she was no longer part of the group."  [Doc. 30 at 5; Doc. 30-1 at 2, ¶ 9].

***Ms. de Picciotto***.  The record establishes the following undisputed material facts with respect to Ms. de Picciotto:

- In addition to "referring to [Plaintiff] by her last name," which made Plaintiff "feel like she was no longer part of the group," at some unidentified point during her employment, Ms. de Picciotto "did not even address" Plaintiff and Ms. Birdie Johnson—the only two Black massage therapists—at group meetings, but would greet everyone else.  [Doc. 30 at 5; Doc. 30-1 at 2, ¶ 9].

- Plaintiff and Ms. Birdie Johnson were omitted from an invitation to a November 2018 meeting, [Doc. 29-8 at 1–2], although Ms. de Picciotto sent them an invitation shortly after she learned of the error.  [Doc. 29-2 at 60:7–61:16; Doc. 29-9 at 2–3; Doc. 29 at ¶ 22; Doc. 30 at ¶ 22].

- In December 2018, Ms. de Picciotto began to "sing" out Plaintiff's name in a saccharine manner—i.e., "[c]hiding, pretending to be sweet when you're actually really upset."  [Doc. 29-1 at 124:2–125:9].

- On a few occasions around Christmas 2018 and January 2019, when Plaintiff would make a comment in a staff meeting, Ms. de Picciotto would respond by stating, "[w]hatever. Let's go on."  [Doc. 30 at ¶ 60; Doc. 35 at 2].

- In approximately January 2019, a representative from Seattle Kaiser visited the CCM because the Seattle Kaiser was considering instituting a similar unit in Seattle. Plaintiff attempted to introduce herself to the Seattle representative, but Ms. de Picciotto placed her body between Plaintiff and the representative, blocking Plaintiff from saying hello. Ms. de Picciotto later introduced the representative to Hannah, one of the other massage therapists. [Doc. 30-1 at 2, ¶ 10; Doc. 30 at ¶ 59; Doc. 35 at 2].

- During approximately the last six months of Plaintiff's employment, Ms. de Picciotto was "extremely terse with [Plaintiff] while her tone did not change with any of the white massage therapists." [Doc. 30-1 at 2, ¶¶ 9–11; Doc. 30 at ¶ 60; Doc. 30-1 at 12, ¶ 2; *id.* at 6, ¶ 3; Doc. 35 at 2].

*Mr. Mills.* The record establishes the following undisputed material facts with respect to Mr. Mills:

- On March 4, 2019, Plaintiff met with Ms. Colleen Johnson and Mr. Mills to discuss what Plaintiff perceived as discrimination based on her race, including her interactions with Mr. Cox, having things removed from her workspace, and Dr. Smigelski and Ms. de Picciotto not saying hello. [Doc. 29-1 at 227:15–18, 229:10–230:14; Doc. 29-2 at 75:24–76:1, 82:13–84:12]. Plaintiff did not ask Mr. Mills to take any action. *See* [Doc. 29-2 at 95:11–96:6; Doc. 29 at ¶ 31; Doc. 30 at 1].

- Defendant acknowledges that Plaintiff "complain[ed] of unlawful racial discrimination" in her meeting with Mr. Mills. [Doc. 29 at ¶ 32].

In addition to the above undisputed facts, Ms. Taylor also submits the declarations of three former employees in support of her claims: Jessi Eads ("Ms. Eads"), Ms. Birdie Johnson, and Ms. Colleen Johnson. [Doc. 30-1 at 6–8, 12–13]. In Ms. Eads's declaration, she states that she worked

as a medical assistant at Kaiser, where she was also a union steward, and she attended meetings where she "witnessed racial discrimination against" Plaintiff and Ms. Birdie Johnson.  [*Id.* at 12, ¶ 1].  Ms. Eads explains as follows:

> I know discrimination is hard to describe because it is subtle.  In the message-therapy department, the discrimination is conveyed mostly by tone of voice and body language.  Both Melissa [d]e Picciotto and Rob Smigelski had a different tone and attitude expressed when talking to Ms. Taylor and Ms. [Birdie] Johnson.  In my opinion, discrimination existed in the massage-therapy department at Kaiser, it was blatant, and it was only against the two Black employees.

[*Id.* at 12, ¶ 2].

In the declaration of Ms. Birdie Johnson, she states that she also worked as a massage therapist with Ms. Taylor at Kaiser, where they were the only two Black massage therapists of approximately nine massage therapists.  [*Id.* at 6, ¶ 1; Doc. 30 at ¶ 75].  Ms. Birdie Johnson states that a couple of months before she went on medical leave in September 2018, Dr. Smigelski "stopped talking to . . . Ms. [Birdie] Johnson" and also "took Ms. [Birdie] Johnson off email threads and all the meeting invitations."  [Doc. 30-1 at 6, ¶ 2.  For instance, Ms. Birdie Johnson "was sitting in the office next to Nancy, an acupuncturist, and Dr. Smigelski said hello to her but said nothing to Ms. Johnson."  [*Id.*].  When Ms. Johnson asked Dr. Smigelski if there was something wrong, he did not utter a comprehensible response.  [*Id.*].  Notably, after Plaintiff and Ms. Birdie Johnson were removed as providers from Kaiser's website, Ms. Birdie Johnson "was told" that she was removed "because she was on medical leave, but a white employee, Jonathan Berkshire who was also [on] medical leave, was not taken off the website."  [*Id.* at 6, ¶ 3].  When Ms. Birdie Johnson questioned her removal with the IT department, IT informed her "that they would only take a provider off the website if that person's department asked them to do so."  [*Id.* at 6, ¶ 3].  In addition, before a meeting on an unidentified date, Ms. de Picciotto told Ms. Birdie Johnson that "I just don't know how to talk to you people."  [*Id.* at 6, ¶ 4].  When Ms. Birdie Johnson expressed

Case 1:21-cv-00012-NYW-NRN   Document 37   Filed 11/10/22   USDC Colorado   Page 29 of 36

to Ms. de Picciotto that she felt the comment "was racist," Ms. de Picciotto responded that "she is not racist because she has Black family members." [*Id.*]. Moreover, prior to working as a massage therapist, Ms. Birdie Johnson worked in Kaiser's cardiology department as a scheduler. [*Id.* at 7, ¶ 6]. When Ms. Birdie Johnson attempted to "make a racial discrimination complaint" to Mr. Mills "regarding how her co-employees were treating her," Mr. Mills "ignore[d] her efforts in spite of their good relationship" at the time. [*Id.*; Doc. 30 at ¶ 82; Doc. 35 at 5].

Further, in the declaration of Ms. Colleen Johnson, she recounts the meeting she attended with Plaintiff and Mr. Mills, stating that "[a]lthough Mr. Mills was polite in the meeting, he was dismissive and did not take [Plaintiff's] complaint seriously. He said that [Plaintiff] probably misunderstood other people's actions and words regarding her. Under Kaiser's rules, he should have begun an investigation of [Plaintiff's] complaint, but nothing happened." [Doc. 30-1 at 8].

Given the record before it, the Court finds that Plaintiff has sufficiently raised a genuine issue of material fact as to whether Defendant's motive for engaging in this conduct was based on her race, namely that Dr. Smigelski and Ms. de Picciotto ignored or generally rebuffed Plaintiff's complaints because of her race. The Court is not persuaded by Defendant's reliance upon Mr. Mills's "conclu[sion]" that Plaintiff's "concerns centered on interpersonal disputes between coworkers and [that] he did not interpret her complaints as race-based discrimination," [Doc. 35 at 10], justifies summary judgment, as opposed to simply being a disputed material fact.

In reaching its conclusion, the Court is guided by the Supreme Court's observation that "there is not, and by its nature cannot be, a mathematically precise test" for a hostile work environment claim, *Harris*, 510 U.S. at 22, as well as the Tenth Circuit's instruction that courts should not "assess a plaintiff's hostile-workplace allegations in a vacuum," *Lounds*, 812 F.3d at 1223, and "[t]he totality of the circumstances is the touchstone of a hostile work environment

analysis," *Hernandez*, 684 F.3d at 959 (cleaned up) (citations omitted).  Indeed, the Tenth Circuit has also explained that "the critical issue in determining whether harassment is because of [race] is whether members of one [race] are subjected to a disadvantage to which the other [race] is not." *Harsco Corp.*, 475 F.3d at 1186.

It is not the role of the Court at summary judgment to determine credibility of the witnesses. Rather, based on the evidence, if believed, a jury could find a work environment that was permeated with intimidation and insult that Ms. Taylor experienced because she is Black.  *See Semsroth*, 304 F. App'x at 726 ("Semsroth's evidence, if believed, is therefore sufficient to establish more than an isolated or occasional incident of gender-based harassment. Rather, the evidence indicates a work environment that was permeated with gender-based intimidation and insult.").  For all of these reasons, viewing the factual record and drawing all reasonable inferences in favor of Plaintiff, as it must, the Court finds that Plaintiff has raised a genuine issue as to whether the conduct she experienced was based on her race.

> **2.     Plaintiff Has Raised a Genuine Issue Regarding Whether the Actions taken by Kaiser, Alone or Together, were Sufficiently Severe or Pervasive.**

As noted above, "'the severity and pervasiveness evaluation is particularly unsuited for summary judgment' because it is inherently fact-found by nature." *Lounds*, 812 F.3d at 1222.  In her Response, Plaintiff addresses specifically whether the conduct at issue "[w]as severe enough," arguing in cursory fashion that "Plaintiff had migraines, with vomiting, once a week. She was tormented by subordinates and ignored by superiors.  She complained to HR, to no avail.  The jury could find it was severe enough." [Doc. 30 at 17].  Although Plaintiff does not expressly address pervasiveness, the Court finds that Plaintiff has sufficiently raised a genuine issue of material fact regarding the severity or pervasiveness of the conduct she experienced at Kaiser, and Defendant fails to sufficiently establish an absence of material fact on this issue.

For instance, Defendant argues that Plaintiff fails to provide any support or context for her assertion that Ms. de Picciotto or Dr. Smigelski exhibited a different "tone" or "attitude" towards her. [Doc. 35 at 8]. However, Defendant does not dispute that in December 2018, Ms. de Picciotto began to "sing" out Plaintiff's name in a manner that was "[c]hiding, pretending to be sweet when you're actually really upset." [Doc. 29-1 at 4–8]. Defendant also does not dispute that "[i]n the last six months or so" of Plaintiff's employment, Ms. de Picciotto "was extremely terse with [Plaintiff] while her tone did not change with any of the white massage therapists." [Doc. 30-1 at 2, ¶ 11; Doc. 30 at ¶ 60; Doc. 35 at 2 (Defendant stating that it "does not dispute the 'facts' alleged in paragraph[] . . . 60")]. These facts weigh against Defendant's argument that Plaintiff cannot establish severity or pervasiveness on the basis that she identifies "comments from Ms. de Picciotto such as, 'whatever' and 'I just can't talk to you people'" on a small number of occasions. [Doc. 35 at 8–9].

Defendant also points to Plaintiff's removal from the shared website, and counters that "Plaintiff acknowledges that others may have also been removed." [*Id.* at 8]. However, Ms. Taylor sufficiently established that she and Ms. Birdie Johnson, the only two Black massage therapists, were removed from the website around the same time. Moreover, it is unclear how *Plaintiff's* acknowledgment that other employees "*may have* also been removed"—despite the fact that Plaintiff was not responsible for such removals—serves Kaiser here, especially given that Kaiser fails to identify any non-Black massage therapists who its IT department had also, *in fact*, removed from the company website.

Kaiser further contends that "being left off of group emails, removed from the website, Ms. de Picciotto's comments, Ms. West pointing and yelling, and Ms. Lyall following [Plaintiff] out of Kaiser[,] even if true, are isolated and discrete incidents involving different individuals." [*Id.*

at 9 n.5].  Kaiser also argues that the "only incident that comes close" to an alteration of the conditions of Ms. Taylor employment is her transfer to a different location in 2018, but notes that she "agreed to the transfer and there is no evidence that she lost any pay or benefits as a result of that action." [Doc. 29 at 17].  However, these arguments fail to address Plaintiff's theory—namely, that Defendant's created a hostile work environment by ostracizing Ms. Taylor as a Black employee, including ignoring complaints of race-neutral bullying or perceived racial discrimination made by her and Ms. Birdie Johnson, the only Black massage therapists.[25]

Nor does Kaiser adequately demonstrate as a matter of law that Kaiser did not know of such treatment, particularly given Plaintiff's claims the environment she endured was overseen by Dr. Smigelski, who reported to Ms. de Picciotto, who in turn reported to Mr. Mills—the three supervisor-level employees whom Plaintiff claims ignored her and/or her complaints of mistreatment—and Ms. Birdie Johnson's statements that she experienced similar dismissive conduct by Dr. Smigelski, Ms. de Picciotto, and Mr. Mills.  *See* [Doc. 29-1 at 135:12–13; Doc. 29-2 at 4:18–23, 5:10–17, 74:21–75:3].  "An employer will be liable 'for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.'"  *Semsroth*, 304 F. App'x at 726 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998).  In addition, "the employer may be liable for a [race-based] hostile work environment 'if the employer fails to take adequate remedial and preventative responses to any actually or constructively known harassment.'"  *Id.* (quoting *Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1069 (10th Cir. 2007)).  "Actual knowledge is usually demonstrable where," as here,

---

[25] Ms. Taylor contends, and Kaiser fails to address, that she "would have preferred that Dr. Smigelski try to change Mr. Cox's behavior, but he did not seem willing to go through that effort." [Doc. 30-1 at 1, ¶ 5; Doc. 30 at ¶ 54]; *see generally* [Doc. 35 (Defendant's failure to address this point)].

the evidence indicates that "the plaintiff has reported harassment to management-level employees." *Harsco Corp.*, 475 F.3d at 1188.

Under the totality of the circumstances of this case, which "is the touchstone of a hostile work environment," *Lounds*, 812 F.3d at 1222 (cleaned up), the Court finds that the issue of severity or pervasiveness is more appropriate for a jury.  Thus, the Court respectfully **DENIES** Defendant's Motion as to Plaintiff's hostile work environment claim under Count I.

### III.     Discriminatory Failure to Pay Severance (Count II)

For her second claim, Ms. Taylor alleges that Kaiser violated Title VII on the basis that Ms. Taylor "was entitled to receive a $45,000 severance payment upon her separation of employment," but Kaiser did not pay her severance "because of [her] race and her attempts to assert her rights under Title VII."  [Doc. 1 at ¶ 39].

Plaintiff's Title VII pay discrimination claim is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that standard, a plaintiff "bears the initial burden to establish her prima facie case of . . . discrimination, which varies depending on the type of adverse action the employee alleges was discriminatory." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007); *see also Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged.").

In this context, a plaintiff bears the initial burden to establish a prima facie case of race-based pay discrimination, by showing "proof of unequal pay between the [plaintiff] and co-workers outside the protected class doing the same work." *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1181 (10th Cir. 2011).  "Of course, if there are no similarly situated co-workers, the employee may be able to make out a claim with evidence that a person outside the protected class would have been paid more for doing the same job." *Id.*  "[I]n any case," however, "the key

to a successful claim is a showing that the employer discriminatorily paid the [plaintiff] too little for the position he or she occupies." *Id.*

If the plaintiff meets her initial burden, the burden shifts to the employer to proffer non-race-based reasons for the pay differences; the employer, however, is not required to prove their reasons. *See Nazinitsky v. INTEGRIS Baptist Med. Ctr., Inc.*, 852 F. App'x 365, 367 (10th Cir. 2021). At the final step, the burden shifts back to the plaintiff to show that the employer's reasons are pretext for discrimination. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). Moreover, as Defendant correctly points out, *see* [Doc. 29 at 19], "[t]he critical *prima facie* inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (citation omitted).

In her Response, Plaintiff does not expressly address her prima facie case. Rather, she argues, *inter alia*, that a material factual dispute exists as to whether she "received notice from Kaiser that her status had changed to a regular employee who should have received a severance." [Doc. 30 at 19].[26] However, even assuming that Ms. Taylor has sufficiently established her prima facie case, Kaiser proffers non-race-based reasons for failing to pay Plaintiff a severance—that is, "as an on-call employee, [Plaintiff] was not eligible for a severance." [Doc. 29 at 20]. Ms. Taylor does not dispute that Kaiser made the decision to not pay her a severance for the above reasons.

---

[26] Plaintiff also claims that "she was damaged because Ms. DePicciotto [sic] falsely submitted [P]laintiff's hours worked," arguing that Ms. de Picciotto "calculated that too many of [P]laintiff's hours were to replace Ms. [Birdie] Johnson, but Ms. [Birdie] Johnson never worked for Kaiser after October, 2018," and therefore Plaintiff "was not covering for her." [Doc. 30 at 18–19]. However, Plaintiff fails to provide any support for the assertion that Ms. de Picciotto "falsely submitted [P]laintiff's hours," and her citation to Defendant's opening brief, *see* [*id.* at 18 (citing [Doc. 29 at ¶ 48])], does not state what she claims it does regarding the alleged falsification of her hours worked.

*See* [Doc. 30].  Thus, because Kaiser has met its burden of providing a facially nondiscriminatory reason for not paying Ms. Taylor a severance, the burden shifts back to Plaintiff to establish that Kaiser's proffered reason is pretext for discrimination.  However, the Court finds that Plaintiff's claim fails at this last step.

To establish pretext on summary judgment, "[a] plaintiff must present evidence to establish there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action was pretextual."  *DePaula*, 859 F.3d at 970.  Here, Ms. Taylor's Response fails to address the issue of pretext at all.  *See* [Doc. 30].  Thus, Kaiser is entitled to summary judgment on Plaintiff's Title VII disparate pay claim.  *See Noel v. Medtronic Electromedics, Inc.*, 973 F. Supp. 1206, 1213 (D. Colo. 1997) ("Noel fails to address the issue of pretext in the context of the unequal pay claim.  Thus, Electromedics is entitled to summary judgment on the Title VII claim for unequal pay."); *cf. Young v. Cobe Lab'ys, Inc.*, 141 F.3d 1187 (10th Cir. 1998) ("Young's claim of pretext and 'suspicion of mendacity' is centered in the general conclusory statements of her affidavit and affidavits of fellow employees; she ignores and fails to address the specific performance deficiencies over the years which are documented in the record.  Young has not come forward with sufficient evidence to establish that Cobe's stated reasons for her termination were a pretext for discrimination.  Accordingly, the district court properly granted summary judgment in favor of defendant on this claim."); *Koon v. Sedgwick Cnty.*, 429 F. App'x 713, 716 (10th Cir. 2011) ("Any argument for pretext based on whether Mr. Koon was actually respected by his fellow employees for his performance as crew chief fails to address our inquiry of whether the County honestly relied in good faith upon the reported leadership deficiencies and animosity between Mr. Koon and Mr. Seiter."); *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169–70 (10th Cir. 2007) ("Evidence

that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility.").

Accordingly, this Court respectfully **GRANTS** Defendant's Motion as to Plaintiff's discriminatory pay claim under Count II.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendant's Motion for Summary Judgment [Doc. 29] is **GRANTED IN PART AND DENIED IN PART**;

(2)    Summary judgment is **GRANTED** in favor of Defendant as to Plaintiff's race-based pay discrimination claim under Count II, and **DENIED** as to Plaintiff's hostile work environment claim under Count I;

(3)    A Final Pretrial Conference is **SET** for **December 1, 2022 at 10:30 a.m.** before Judge Nina Y. Wang in Courtroom A-502; and

(4)    **Seven (7) days** prior to the Final Pretrial Conference, the Parties shall submit a proposed Final Pretrial Order using the form found on the District of Colorado's website. The Parties shall jointly file their proposed Final Pretrial Order via CM/ECF and shall also send an editable Microsoft Word version to Wang_Chambers@cod.uscourts.gov.

DATED:  November 10, 2022                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge